Filed 9/11/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAIME A. SCHER et al., <br><br> Plaintiffs, Appellants and Respondents, <br><br> v. <br><br> JOHN F. BURKE et al., <br><br> Defendants, Appellants and Respondents. | B235892 <br><br> (Los Angeles County <br> Super. Ct. No. BC415646) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge. Reversed in part, affirmed in part.

Law Offices of Robert S. Gerstein, Robert S. Gerstein; Law Offices of Bennett Kerns and Bennett Kerns for Defendants, Appellants and Cross-respondents John Burke, Germaine Burke and Bennett Kerns.

Levinson Arshonsky & Kurtz, Richard I. Arshonsky, Jason J. Jarvis; Garrett & Tully, Ryan C. Squire and Zi C. Lin for Defendants, Appellants and Cross-respondents Richard Erickson, Wendie Malick, Andrea D. Schroder and Richard B. Schroder.

Ferguson Case Orr Paterson, Wendy C. Lascher and Joshua S. Hopstone for Defendant, Appellant and Cross-respondent Gemma Marshall.

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

Cunningham & Treadwell, James H. Treadwell and Steven F. Kuehl for Plaintiffs, Respondents and Cross-appellants.

---

INTRODUCTION

This is a dispute between landowners about the right to vehicular access over two roads in the unincorporated Topanga Canyon area of Los Angeles County. After trial to the bench, the court ruled that the two roads had been dedicated as public streets, and that plaintiffs, Jaime A. Scher and Jane McAllister, had an implied easement over the roads for access to their property. Defendants,[1] all of whom own land along the two roads south of plaintiffs' property, appeal from the portion of the judgment burdening their land and enjoining them from obstructing vehicular access. The court also found that plaintiffs had not established their right to an express, prescriptive, or equitable easement for access along the roads and across defendants' properties. Plaintiffs appeal from this part of the judgment in favor of defendants.

In the published portion of this opinion, we hold that Civil Code section 1009 bars all use of non-coastal private real property, not simply recreational use of such property, from ever ripening into an implied dedication to the public after the effective date of that statute. Hence, the trial court erred in considering evidence about use of the subject roads after March 4, 1972 to support its finding that the roads were impliedly dedicated to public use.

In the unpublished portion of this opinion, we hold that the trial court misapplied the law when it ruled that plaintiffs have an implied easement that arose before 1902, while the land was still owned by the federal government. We also conclude that the court erred in ruling that the two roads were dedicated to public use during that time. There is no evidence of the roads' use before 1972 such as would support a finding that

---

[1] Defendants are Gemma Marshall, Richard Erickson and Wendie Malick, Richard B. and Andrea D. Schroder, Christina Erteszak, Northern Trust Bank, N.A., Bennett Kerns, Trustee of the A.S.A. Trust, dated June 28, 2005 "on behalf of John Burke & Germaine Burke," John F. and Germaine Burke.

2

they were impliedly dedicated as public streets.  With respect to plaintiffs' appeal, we conclude that the trial court did not err in ruling that plaintiffs failed to prove they had an express easement or an easement by prescription, or were entitled to an equitable easement.

Accordingly, the portion of the judgment against defendants is reversed and the portion of the judgment against plaintiffs is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

For simplicity, we will not identify the parties' predecessors in title.  (Cf. *Jones v. Tierney-Sinclair* (1945) 71 Cal.App.2d 366, 368 [declining to distinguish acts done by the parties from those committed by predecessors in interest].)

1. *The land in the area at issue*

In the late 1700s, the federal government began surveying the western United States pursuant to the Public Land Survey System.[2]  The government divided the land into "townships," and split each township into 36 square-mile "sections."  At issue here are Sections 1, 7, and 12, in a township located in the Santa Monica Mountains.

The two roads at issue are Henry Ridge Motorway and Gold Stone Road.[3]  Henry Ridge Motorway runs approximately north/south along Henry Ridge, above Topanga Canyon, from Alta Drive in Section 1 in the north to near its southern end where it connects with Gold Stone Road in Section 12.  The junction between Henry Ridge Motorway and Gold Stone Road is a hairpin turn where Henry Ridge Motorway measures about 12 feet wide.  Gold Stone Road runs from Henry Ridge Motorway easterly into Section 7 where it terminates at Greenleaf Canyon Road, a public street.

---

[2]  We grant defendants' motion filed on July 6, 2012, to take judicial notice of an article from the United States Department of the Interior's website concerning the Public Land Survey System, <http://nationalmap.gov/small_scale/a_plss.html>.

[3]  Gold Stone Road is identified in the record variously as "Goldstone" Road and "Gold Stone" Road.  For consistency, and following the parties' lead, we will use the two-word name.

Greenleaf Canyon Road ends in the south at Topanga Canyon Boulevard, which eventually leads further south to the town center of Topanga.

From the north, Henry Ridge Motorway may be reached from Mulholland Boulevard via Adamsville Avenue and Alta Drive, both public roads, or Oldfield Ranch Road and Summit to Summit Road. From the south, Henry Ridge Motorway was accessible from School Road until the early 1990s when the school district installed gates. Now, the only outlet from the southerly part of Henry Ridge Motorway is through Gold Stone Road to Greenleaf Canyon Road.

Plaintiffs' land is the northernmost of the parties' properties on Henry Ridge Motorway in Section 1; all of defendants' properties lie to the south of plaintiffs' land. From Alta Drive south through plaintiffs' property, Henry Ridge Motorway is paved. Immediately south of plaintiffs' property lie four successive parcels owned by non-parties where Oldfield Ranch Road branches off to the east. At some point, the pavement ceases and Henry Ridge Motorway is indicated on a local map as a "trail." Defendant Marshall owns the next southerly parcel on the unpaved trail, also in Section 1. Abutting Marshall to the south, where Section 12 commences, lie two parcels on Henry Ridge Motorway owned by defendants Erickson and Malick. (We will refer to these parcels as Erickson/Malick north and Erickson/Malick south, respectively.) Henry Ridge Motorway divides the Erickson/Malick south parcel to the west from the Schroder defendants' property to the east. Henry Ridge Motorway turns into Gold Stone Road as it bends generally eastward through the Schroder property toward Section 7. There, it cuts across land owned by defendant A.S.A. Trust, Kerns Trustee, and crosses onto the Burke defendants' property. The Burkes' driveway opens onto Greenleaf Canyon Road.

Plaintiffs also own an undeveloped lot off of Old Topanga Canyon Road in Section 12 that does not touch on Henry Ridge Motorway or Gold Stone Road.

4

[[2. *The evidence of the roads' existence*

a. *the 1895 survey plat*

Soon after California became a state, the federal government surveyed the Topanga Canyon area. A survey plat dated 1895 is divided into section squares, like graph paper. In Sections 1 and 12, the 1895 survey plat shows a dotted line lying next to a solid-line "Road," located generally in the area of Henry Ridge Motorway wending roughly along the ridge line, across the land corresponding to property now owned by Marshall, Erickson/Malick, and Schroder. Exactly where the "Road" lay in 1895 cannot be established. At the time, the property belonged to the United States Government. The 1895 survey plat also reflects a dotted-line identified as a "Trail" lying to the east of the "Road," and located in Section 1 generally where Greenleaf Canyon Road lies now. Plaintiffs' title expert Anya Stanley inferred from the survey plat that in 1895, the "Road" along Henry Ridge was more established than the "Trail."

Viewing a composite map that she compiled from the 1895 survey plat, Stanley surmised, although acknowledging it was difficult to decipher, that while still federal land, the "Road" extended along what is now Henry Ridge Motorway, through Marshall's, Erickson/Malicks', and Schroders' land, and may "possibly, depending upon how accurate this [composite] map is," have crossed land now owned by the Burkes. Stanley acknowledged that her compilation map did not actually show this "Road" connecting to Greenleaf Canyon. By contrast, defendants' expert surveyor John MacNeil explained that the surveyors' task in 1895 was to set the section corners, not survey roads. MacNeil pointed out that the 1895 survey plat upon which Stanley relied was not intended to plot the course of a road, but only to show that it existed.

Stanley did not know who built the "Road" along the ridge line or whether the federal government improved the "Road" before 1911. Stanley postulated that early native American traders may have used the "Trail."

5

b. *the United States Government homestead patents*

The parties in this case trace their titles to grants issued under the federal Homestead Act (Act of May 20, 1862, ch. 75, §§ 1-8, 12 Stat. 392; Act of Mar. 3, 1855, ch. 207, 10 Stat. 701; Act of Apr. 24, 1820, ch. 51, 3 Stat. 566; *Murphy v. Burch* (2009) 46 Cal.4th 157, 168, citing *Granite Beach Holdings v. State* (Wash.App. 2000) 11 P.3d 847, 854) (the Homestead Act). The Homestead Act required those seeking to own land to occupy and cultivate or mine up to 160 acres for at least five years and then file an application to the United States Government for a patent. A patent is the official document reflecting the federal grant conferring fee simple title to public land. (*Murphy v. Burch, supra,* at p. 162 & fn. 1 (*Murphy*).)

Records from the Federal Bureau of Land Management and the Los Angeles County Recorder's Office show that the United States issued a patent for the Erickson/Malick north property in 1902. The patent covering the Erickson/Malick south property and the Schroder property was issued in 1903. The patent for plaintiffs' land is dated 1907. The predecessors of Marshall and of the Burkes each obtained their patents in 1911. The parties own only portions of the properties originally patented to their predecessors. Over the past century and a half, all of the homesteaded land has been subdivided into smaller parcels. The patents in this case specifically reserved to the United States previously vested and accrued water rights, previously granted mineral rights, and rights-of-way for ditches and canals.

c. *the 1908 map*

A map of Topanga in 1908, derived by MacNeil from earlier maps, labeled the "Road" from the 1895 survey plat as the "Ridge Trail," while the 1895 "Trail" became "Greenleaf Road." The 1908 map does not clarify the locations of the 1895 "Road" or the 1908 "Ridge Trail." Stanley testified the route of the "Ridge Trail" has changed since the 19th century. For example, the 1908 "Ridge Trail" is not identical to what is now Henry Ridge Motorway because the modern road extends farther north than in 1895, and was reconfigured in the south to follow a straighter path into what is now School Road. MacNeil created the 1908 map from the 1895 survey plat, never intending it to constitute

6

a survey of the location of Henry Ridge, and so he testified it was "never established that it was [Henry Ridge] Motorway all the way to [Greenleaf Canyon Road]." The 1895 survey plat and the 1908 map do not identify the roads' actual locations a century ago, and there is no other evidence to indicate whether today's Henry Ridge Motorway exists in the same location as "Ridge Trial" did on the 1908 map, or in 1902 when the first patent was issued in this case.

d. *maps from the 1930s*

No road or trail is identified in that area on the "Early subdivisions and points of interest map of Topanga Canyon in the 1930s." What was identified as the "Trail" in the 1895 survey plat and "Greenleaf Road" in 1908, became "Greenleaf Canyon Road" on the 1930s map.

"Henry Ridge Motorway" first appears by that name in CSB maps from the 1930s. CSB maps are County of Los Angeles surveys that define alignments of proposed as well as existing roads. The CSB maps from 1935 and 1937 depict "Henry Ridge Motorway" as extending north all the way to Mulholland Drive, which was a "major public street" then. In the 1930s, Cal-Trans considered a "motorway" to be a banked road that either was or would be graded to accommodate motor vehicles, as opposed to a horse-drawn carriages or stage coaches. More recently, the County defined "Motorway" as "[a] truck *trail* or *trail through mountainous terrain*, usually for *fire equipment usage* or service access; e.g., power lines, Nike sites, etc. *Not for public use*."[4] (Italics added.) In the late

---

[4] We grant defendants' request to take judicial notice of the Street Name Policy of the County of Los Angeles Department of Public Works as of June 28, 1999, and the House Numbering and Street Naming Manual of the Los Angeles Department of Public Works, dated April 1999. Plaintiffs oppose the request on the ground this document was not before the trial court. However, the naming of a street is a legislative act (Gov. Code, § 34091.1) and the question of what "Motorway" means is a question of law, which we independently decide, regardless of whether the issue was before the trial court. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 ["As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation."].)

1930s, the County Fire Department built and graded Henry Ridge Motorway from Adamsville Road to School Road in case of brush fire.

e. *the 1949 Easement – Sections 7 & 12*

In 1949, a predecessor-in-interest of the Burkes granted to the prior owner of the Schroder and Erickson/Malick south properties an "appurtenant" easement "for roadway purposes" for "ingress to and egress from the said Greenleaf Canyon Road to the property of" the Schroder and Erickson/Malick south parcels in Sections 7 and 12 respectively. (The 1949 Easement)  The 1949 Easement over Burke's property ran generally where Gold Stone Road today crosses the Burke land, and was "just a drive, private driveway" then.  The grant further provided that "*in the event*" the state or county "accept[ed] the roadway as a public road," then the grantor and her successors in interest "consent[ed] to the dedication of the said road."  (Italics added.)  The record contains no acceptance by a public entity.  The 1949 Easement burdens Burkes' property and benefits the Erickson/Malick south and Schroder properties, but does not benefit plaintiffs' Section 12 property.

f. *the 1950 maps*

Witnesses testified that Henry Ridge Motorway's route has changed over the years.  There have been minor changes in the road's alignment.  It was straightened out and paved in part.  The road previously went over the top of a ridge on plaintiffs' property.  Henry Ridge Motorway was moved to the west as much as 150 feet to a location down along the side of a hill.  Also, the road once came within 40 feet of plaintiffs' house.  MacNeil did a comparison of Henry Ridge Motorway in 1952 to the 1895 survey plat and found that in some places the road had moved four to five hundred feet.  The first time "Goldstone Road" was shown on a map, was in a 1952 CSB map.

g. *the 1960s maps and the Thomas Brothers' Guide Maps*

Henry Ridge Motorway was still not much of a road in the 1960s despite its depiction on the 1930s CSB maps.  Two government maps from 1967 reflect "Henry Ridge" as a nameless, "unimproved dirt" road.  Although the phrase "HENRY RIDGE" appears in all capital letters on the 1967 maps, all of the roads in the

8

area, including large roads such as Topanga Canyon Boulevard, are identified in lower case letters. One of the 1967 maps indicates an unimproved dirt road in the general vicinity of what is now Gold Stone Road.

Thomas Brothers' Guide maps from 1960 and 1966 show a road identified as "Henry Ridge Road" and "Henry Ridge Motorway." Neither shows Gold Stone Road or a road where Gold Stone Road lies today. The Thomas Brothers' Guide maps in 1983 list Gold Stone Road as a private dirt road. Gold Stone Road was first paved around 1987. The Thomas Brothers maps in 1996 and 2001 show "Henry Ridge Mtwy" and "Gold Stone Road." Stanley acknowledged that Thomas Brothers Guides sometimes contained errors and showed roads that do not actually exist.

h. *the 1968 Declaration of Easement – Section 12*

In 1968, the owner of the property comprised of the Schroder and Erickson/Malick's southern parcels in Section 12, decided to subdivide the land into four parcels, A through D. To provide the new parcels with access to a public street, i.e., Greenleaf Canyon Road, the grantor recorded a "Declaration and Grant of Easements" for "road purposes and to be appurtenant to all land in said Sec. 12" as depicted on an attached map (1968 Declaration).

The 1968 Declaration specifies that its easement offer would "tak[e] effect upon" the recording by any Section 12 fee owner of an "acceptance." Additionally, the 1968 declaration mimics the language of the 1949 Easement as it was also made *"with the understanding that in the event* a final tract map or parcel map [were recorded] over any portion of this division dedicating . . . to public use streets . . . which are accepted by the County," the easement "shall no longer be of any force or effect." (Italics added.) Neither an acceptance of the easement by the fee owner, nor a final tract or parcel map was ever recorded. The easement's route as depicted on the map attached to the 1968 Declaration differs considerably from the route of Gold Stone Road today. Also, as there is no evidence of any consent to change the easement's route to conform to the current road, there are portions of southerly Henry Ridge Motorway and Gold Stone Road over which the 1968 Declaration does not appear to grant an easement.

9

i. *the 1970 Easement Declarations – Sections 1 & 12*

On July 16, 1970, the owner of land now held by Marshall, the previous owner of Erickson/Malick's northern parcel, and the predecessor of McCoy who is not a party to this lawsuit, executed identical instruments, all signed by the same person and recorded on the same day, entitled "Declaration and Grant of Easements" (the 1970 Declarations). Using almost the same language as the 1968 Declaration, the three 1970 Declarations were designed to facilitate a proposed division of the relevant land in Sections 1 and 12 into smaller parcels. Accordingly, the 1970 Declarations created strips of land shown on attached maps to be "*easements for road purposes and to be appurtenant to all land*" in the respective sections, namely Section 1 for the Marshall property, and Section 12 for the Erickson/Malick north property, "the vesting of title to said easements to take effect upon recording . . . by any fee owner of a portion of said Sec. . . . of an acceptance of said easements." (Italics added.) The record contains no acceptance. There is conflicting evidence about the route of the easements and dedicated road created by the 1970 Declarations.

The 1970 Declarations also state: "OWNER makes this declaration *with the understanding that in the event* a *final tract map or parcel map* is caused to be filed with the County Recorder over any portion of this division, dedicating or deeding to public use streets and highways for said map *which are accepted by the County* of Los Angeles, this declaration insofar as said lands are affected by said final tract map or parcel map, shall no longer be of any force or effect." (Italics added.) The legends on two of the maps attached to the three 1970 Declarations indicate a solid line representing "Dedicated roads, per attached declaration . . . ." No acceptance of any of the 1970 Declarations was recorded. Neither the Marshall nor the Ericson/Malick north properties was subdivided according to the 1970 Declarations.]]

[[End nonpublished portion]]

10

3. *The irrevocable offers to dedicate trail easements*

a. *Marshall's hiking and equestrian trail dedication on Henry Ridge Motorway*

To develop her land in Section 1, Marshall was required to obtain a permit from the California Coastal Commission. As a condition to granting the permit, the Coastal Commission required Marshal to "record" an instrument "irrevocably offering to dedicate . . . an easement for a hiking and equestrian trail for public use" of the Topanga-Henry Ridge Trail, which crosses part of Henry Ridge Motorway on her land. Marshall's 1989 irrevocable offer "dedicate[d] to the People of California an easement in perpetuity *for the purposes of hiking and equestrian trail . . . .*" (Italics added.)

The attached Coastal Commission Staff Report and Recommendations found and declared that "The Topanga-Henry Ridge Trail traverses the *private access road* (Henry Ridge Motorway) . . . ." (Italics added.) Continuing, the report states, "these privately maintained roads have become commonly used recreational links between growing centers of development in the mountains. While currently unimproved, these roads . . . functioned as public thru-ways and have historically been open to unobstructed vehicular and pedestrian traffic. It is likely that demand for this particular trail will increase as the immediate area is built out." (Italics added.) "Henry Ridge Motorway is commonly used by equestrians, hikers, and joggers. Formal dedication may not be necessary to continue the use of this trail, because as in the case of other commonly used trails in the mountains, there is strong likelihood that prescriptive rights have been established." (Italics added.)

b. *trail dedication on Henry Ridge Motorway by predecessors of the Schroders and Erickson/Malicks*

In 1992, prior owners of the Schroder and Erickson/Malick south properties in Section 12 recorded an "Irrevocable Offer to Dedicate Trail Easement and Declaration of Restrictions," the purpose of which was to "allow[] public pedestrian and equestrian ingress and egress and for public recreational purposes." (Italics added.) The Dedication affected a 20-foot wide strip of property that was contiguous with, and over the portion of Topanga-Henry Ridge Trail that lies within the owner's parcel, and specifically limited

11

the "right of public use of the easement" "to daylight hours, from one hour before sunrise to one hour after sunset." The offer did not involve Gold Stone Road.

As reflected in the document, this trail dedication was a condition of a Coastal Commission development permit. The Dedication states that "the Property is a parcel traversed by a trail used for public recreation and access . . . ." The declaration contained the condition that the grantors would not interfere "with [the] *present* public use of this road." (Italics added.) The restriction provides that the offer of dedication shall not be "construed to allow anyone, prior to acceptance of the Offer, to interfere with any rights of public access acquired through use which *may* exist on the Property." (Italics added.)

The attached staff report reflects the Coastal Commission's mounting concern about the effects of increased development in the area on recreational use. The report notes that Henry Ridge Trail provides access and helps to connect areas with the "remainder of the trail system." These trails "have become important and commonly used recreational assets and a means of providing access to and links between natural, scenic, and recreational areas in the mountains." However, "[r]esearch has shown that a major deterrent to public use of recreational trails and similar public recreation areas and facilities is a perception by the public that the areas involved are private." The report observes that "development tends to preempt public access, partly due to the 'feeling of trespass' engendered by the predominance of private development" and notes the necessity of placing conditions on development "to formalize the *public's right to continued use of these trails*."[5] (Italics added.)

4. *Use of Henry Ridge Motorway and Gold Stone Road by plaintiffs and others*

Much of this lawsuit concerns whether and in what manner Henry Ridge Motorway and Gold Stone Road were used by the public.

---

[5] Plaintiffs introduced into evidence numerous other documents and instruments in defendants' various chains of title. We will not include these exhibits here because they are not cited by the trial court and the evidence does not show that these instruments affect the result here.

12

[[a. *Pre-1972*

Unable to locate eyewitnesses from the 1800s through the early 1900s, plaintiffs relied on inferences from photographs, lot books, the parties' chains of title, historical-society documents, and the above-described maps and instruments. The 1908 map reflects some development in the Topanga Canyon area, such as houses, a tavern, a post office, inns, campsites, a general store, and a school. A tavern with cabins operated in 1908 on Chaney's Road, east of Greenleaf Road. Automobiles were photographed at the Topanga General Store in the 1920s. Photographs show the evolution of the area's development starting with mail delivery in 1880, although plaintiffs' expert Stanley admitted "it [the photography] doesn't prove anything." *No development is depicted along the "Ridge Trail" in 1908*. Instead, all of the development is accessible from other roads, including the "Topanga to Calabasas Road," now called Old Topanga Canyon Road.

Pauline Stewart conveyed her Section 1 property to plaintiffs in 1998.[6] She testified that Henry Ridge Motorway was both public and private. She stated that the roads at issue "have been used for fifty years" and "there wasn't any question" that "those roads had been public property for so long." Yet, Stewart admitted she did not personally know of anyone driving Gold Stone Road to Henry Ridge Motorway.]]

b. *After March 4, 1972*

When Pauline Stewart, the "matriarch of Henry Ridge," moved to Henry Ridge Motorway in 1977, it was merely a "fire road." In 1984, the Los Angeles County Fire Department notified Stewart that it would no longer maintain the road because the "*County had designated it as a private road.*" (Italics added.) Stewart described Henry Ridge in a 1988 letter as "a road on *private property* so it is *considered a private road*, it

---

[6]   Aged 91 at the time of trial, Stewart was unavailable to testify and so her deposition was read into the record.

is *not a public thoroughfare*, even though it is open to the public for all practical purposes." (Italics added.)

Stewart's own travel on Henry Ridge Motorway was almost exclusively northbound from plaintiffs' property and not southerly through defendants' land. The only roads that were continuously used for access to and from plaintiffs' property were Adamsville and Alta to the north. Stewart used Gold Stone Road twice in 20 years. She had no personal knowledge of anyone using Gold Stone Road to Henry Ridge Motorway; she did not even know whether her husband used Gold Stone Road. Nor did Stewart know whether any property owners on Henry Ridge Motorway or Gold Stone Road dedicated those roads to public use. She was unaware of facts that would show that the general public had used Henry Ridge Motorway to Gold Stone Road to Greenleaf Canyon on a regular basis. She stated, "*I don't know anybody in their right mind that would even try to go that way.*" (Italics added.)

Plaintiffs called a series of witnesses who described their use of Henry Ridge Motorway and Gold Stone Road. These witnesses, including plaintiffs, their neighbors, defendants, friends, handymen, tenants, and others in the area, also described who they saw driving along the two roads. *None of the witnesses described use of or activity on the two roads before March 4, 1972.*

Plaintiffs purchased their Section 1 property in 1998. They have an easement, recorded in 1948, giving them access *northerly* along "that certain road only, now known as a fire road and connected with proposed Mulholland Blvd." Plaintiffs' tenants' leases specify that the tenants may use Henry Ridge Motorway to the north for access but not to the south, except "in case of dire emergency." Plaintiff Scher testified that since purchasing his Section 1 property he intended to establish rights south along Henry Ridge Motorway and Gold Stone Road.

Plaintiffs bought their Section 12 property off of Old Topanga Canyon Road in 2007. Undeveloped, plaintiffs' Section 12 lot measures 1,250 square feet and does not touch Henry Ridge Motorway or Gold Stone Road. Scher testified he bought the Section 12 lot " 'partially to stick a thorn in my neighbor's side' " and because plaintiffs

14

wanted to claim a right to use the two roads at issue under the Declarations of Easements, which plaintiffs believed benefitted Section 12 owners, but not plaintiffs' Section 1 property.

Marshall purchased her property in 1987. In 1990, after recording her trail dedication and obtaining a Coastal Commission development permit, Marshall began constructing a residence located 24 feet from Henry Ridge Motorway. Marshall posted signs on the northern and southern boundaries of her property declaring "Private Road permission to pass subject to control of owner. Penal Code 602 and Section 1008 Civil Code." Marshall hung the signs to prevent people from gaining prescriptive rights on her property.

In 1991, Marshall installed a locked gate across Henry Ridge Motorway on the northern boundary of her land and later electrified it. Marshall gave gate keys for emergencies to the fire department and her neighbors, including Stewart, who passed one on to plaintiffs when they bought the property. When closed, the gate prevents only vehicular access; hikers and equestrians can circumnavigate it.

Erickson and Malick, attracted by the quiet and privacy, purchased their north parcel in 1996 and their south parcel in 2000. Erickson "religiously" stops drivers on Gold Stone Road and Henry Ridge Motorway who he does not recognize. Erickson once challenged Scher's right to use the road on the Erickson/Malick south property. Malick has "often" stopped people on Gold Stone Road because they were following the Thomas Brothers' Guide to Henry Ridge Motorway. In 2008, Erickson and Malick recorded two declarations granting consent to use Henry Ridge Motorway on their two parcels pursuant to Civil Code section 813.

The Schroders have lived on their land since 2005, in part because of the privacy it afforded. Their seller and realtor told them there were no ingress and egress easements on Gold Stone Road. Schroder has been vigilant about keeping drivers off Gold Stone Road. He "always" stops drivers and redirects them unless they are guests of the Erickson/Malicks. There are two gates across Gold Stone Road.

15

The Burkes bought their Section 7 land in 1993. In 2005, they bought the unimproved land now held by the A.S.A. Trust to prevent development and ensure privacy. There is a sign at the intersection of Greenleaf Canyon Road and Gold Stone Road declaring the latter to be "Private." Another sign reads, " 'No access to Henry Ridge Road. Locked gates ahead.' " On a wooden gate at the junction of Gold Stone Road, Greenleaf Canyon, and the Burkes' driveway stands a sign since at least 1993 that forbids trespassing, parking, dumping, and loitering. The Burkes posted the signs pursuant to Civil Code section 1008 so that people would know they were permissively driving on Gold Stone Road. Since they moved into their Section 7 property, the Burkes have stopped passersby to re-direct those not entitled to use Gold Stone Road.

5. *Alternative routes*

Plaintiffs calculate that traveling Henry Ridge Motorway south to Gold Stone Road is more convenient because this route to Topanga center takes 7 to 10 minutes. There are numerous roads connecting to Henry Ridge Motorway in the north to Topanga center, but those routes take plaintiffs 18 to 20 minutes. Plaintiffs claim they are unable to use Henry Ridge Motorway and Gold Stone Road to evacuate to the south in case of emergency.

In 2005, plaintiffs discovered that the lock on Marshall's gate was jammed. Plaintiffs sent Marshall letters demanding a new key and claiming an express easement to use Henry Ridge Motorway. Plaintiffs also sent letters to Erickson/Malick and discussed the issue of access to the two roads with Schroder. People consulted with their title insurers.

6. *The litigation*

Plaintiffs filed their complaint alleging that defendants' properties are burdened, and plaintiffs are benefitted, by express easements for ingress and egress along Henry Ridge Motorway and Gold Stone Road. The complaint sought to quiet title to the easements and sought declarations that: (1) plaintiffs are the beneficial owners of express, prescriptive, and equitable easements to use Henry Ridge Motorway and Gold

16

Stone Road; (2) defendants have acquiesced to the dedication to public use of the entirety of Henry Ridge Motorway and Gold Stone Road across defendants' properties; and (3) plaintiffs are entitled to use Henry Ridge Motorway and Gold Stone Road as a public street. The complaint also sought to enjoin defendants from interfering with plaintiffs' use of the two roads. After trial, plaintiffs amended their complaint according to proof to add a cause of action for implied easement.

[[Begin nonpublished portion]]

[[The trial court issued a 19-page statement of decision finding: (1) plaintiffs had an implied easement for vehicular ingress and egress that arose before the federal Government conveyed the land by patents in 1902; (2) Henry Ridge Motorway and a portion of Gold Stone Road at Greenleaf Canyon Road were dedicated to the public when the land was still owned by the United States Government; (3) the public has vested rights to use the roads under the doctrines of implied-in-law and implied-in-fact dedication; and (4) plaintiffs failed to prove they had an express, prescriptive, or equitable easement.]]

[[End nonpublished portion]]

The trial court entered judgment declaring that Henry Ridge Motorway and Gold Stone Road had been impliedly dedicated as public streets and quieting title to easements over the two roads in favor of plaintiffs. The judgment enjoined and restrained defendants from obstructing the roads. The court also entered judgment against plaintiffs on their theories of express, prescriptive, and equitable easement. Defendants appeal and plaintiffs appeal.

CONTENTIONS

Defendants' appeals challenge the portions of the judgment against them and plaintiffs' appeal challenges the portion of the judgment against them.

17

DISCUSSION

I

DEFENDANTS' APPEAL

[[Begin nonpublished portion]]

[[Implied Easement Based On Federal Patents

1. *The elements of implied easements*

Defendants contend that the trial court erred as a matter of law in ruling that the federal patents created an implied easement over Henry Ridge Motorway because the common ownership element was lacking.[7]  The trial court found the evidence "manifest" that Henry Ridge Motorway existed and was used before the first division of title in 1902 when the federal government issued the first patent.

The law will imply an intent to create an easement by grant or reservation in the absence of a written document evincing intent.  (6 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 15:19, p. 15-18.)  Easements will be implied if the following conditions exist at the time of the conveyance:  "1) the owner of property conveys or transfers a portion of that property to another; 2) the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use; and 3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement."  (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 141,

---

[7]    We do not read the judgment as finding an implied easement for access over Gold Stone Road, plaintiffs' suggestion to the contrary notwithstanding.  To the extent that the statement of decision could be read as having declared an implied easement over a portion of Gold Stone Road, our holding as it relates to the ruling concerning an implied easement for access on Henry Ridge Motorway likewise applies to Gold Stone Road.

fn. omitted (*Tusher*); see also Civ. Code, § 1104;[8] 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property § 392, p. 460.)

The grantee is said to have a *grant* of a right of way when an access easement by implication benefits the conveyed parcel. Conversely, the grantor has impliedly *reserved* an access easement across the grantee's property when the easement by implication is retained for the benefit of the grantor's parcel. (*Murphy*, *supra*, 46 Cal.4th at p. 163.)

" ' "The law does not favor the implication of easements. Such implication can only be made in connection with a conveyance, and in view of the rule that a conveyance is to be construed against the grantor . . . . Whether an easement arises by implication on a conveyance of real estate depends on the intent of the parties, which *must clearly appear* in order to sustain an easement by implication." ' " (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1420, italics added (*Thorstrom*).) " ' "The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances." [Citation.]' " (*Ibid.*; cf. *Moores v. Walsh* (1995) 38 Cal.App.4th 1046, 1049.) Thus, an easement by implication will only be found when there is "*clear evidence*" that the parties intended it "*at the time of the original transfer of the property*" by the common grantor. (*Tusher*, *supra*, 68 Cal.App.4th at p. 143, italics added; *Thorstrom*, *supra*, at p. 1420; *Fristoe v. Drapeau* (1950) 35 Cal.2d 5, 8.)

The claimant has the burden of proving each element of the cause of action for an implied easement by a preponderance of the evidence. The trial court's factual findings are binding on the appellate court if supported by substantial evidence. (6 Miller & Starr, Cal. Real Estate, *supra*, § 15:19, p. 15-82, citing *Tusher*, *supra*, 68 Cal.App.4th at p. 145.) However, whether common ownership may be established by reference to

---

[8] Civil Code section 1104 reads: "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed."

19

federal patents presents a legal question which we review de novo. (*Kellogg v. Garcia* (2002) 102 Cal.App.4th 796, 802-803.)

2. *Common ownership is lacking.*

The first required element is that the dominant and servient tenements were held by the same owner at the time of the conveyance giving rise to the implied easement. (*Tusher*, *supra*, 68 Cal.App.4th at p. 141.) The United States Government can be the common owner of land conveyed by a federal patent. (*Murphy*, *supra*, 46 Cal.4th at p. 161.) However, "conveyances involving a sovereign as a common owner typically do not give rise to implied *reservations* of easements." (*Id*. at p. 165.)

In *Murphy*, the plaintiff seeking to establish an implied access easement by necessity argued that the relevant conveyance was the first one in 1929, when the federal government deeded the parcel containing the defendants' servient property, reasoning the government impliedly retained ownership of plaintiff's dominant land and hence impliedly *reserved* an access easement for itself. (*Murphy*, *supra*, 46 Cal.4th at pp. 167-168.) Conversely, the defendants fighting the easement across their land asserted that common ownership could not be established because the relevant conveyance was the later 1932 patent deeding the plaintiff's dominant tenement, by which time the government no longer owned the servient property. (*Id*. at p. 168.) The Supreme Court in *Murphy* stated, "We agree that an easement by necessity cannot arise by implication from the 1932 conveyance because common ownership was lacking." (*Ibid.*) Thus, the conveyance giving rise to the reservation of an easement by implication is the one transferring the dominant tenement.

Here, just as in *Murphy*, the relevant conveyance is the patent to plaintiffs' Section 1 ancestor because plaintiffs seek to establish their right, as the dominant tenement holders, to use Henry Ridge Motorway as it crosses defendants' servient properties. However, plaintiffs' property was patented in 1907, by which time the northerly Erickson/Malick property had already been conveyed by patent in 1902 and the Schroder and southerly Erickson/Malick property had already been conveyed in 1903. Thus, no easement can arise by implication because by the time the federal government

20

issued the patent to plaintiffs' predecessor in 1907, the United States no longer owned any of these servient tenements. (*Murphy*, *supra*, 46 Cal.4th at p. 168.) The common ownership element is missing.

Plaintiffs point out that *Murphy* concerned an easement by necessity, not at issue here. Nonetheless, the Supreme Court's holding still applies. Common ownership is an element of both implied easements in general and implied easements by necessity. (Compare *Tusher*, *supra*, 68 Cal.App.4th at p. 141 & *Murphy*, *supra*, 46 Cal.4th at p. 167.) If the *Murphy* court declined to find an implied easement even though necessity may have justified it, then certainly no easement should be inferred here where necessity is not even claimed.

We are mindful of the fact that the patent to Marshall's predecessor in 1911 is later than the patent to plaintiffs' Section 1 land. Thus, the federal government was the common owner of Marshall's and plaintiffs' land at the time of relevant conveyance. However, even if plaintiffs might have an implied easement across Marshall's property, that is the extent of their right. Stated otherwise, plaintiffs' implied easement for access would end at the boundaries of Marshall's land, and plaintiffs could travel no farther south without encroaching on the lands of Erickson/Malick and Schroder. We decline to otherwise imply an access easement by necessity over Marshall's property as there is no showing of strict necessity. Plaintiffs' land is by no means landlocked. (See, e.g., *Murphy*, *supra*, 46 Cal.4th at p. 164.)

3. *Plaintiffs produced no evidence that the federal government intended to reserve an access easement when it issued its patents*.

Common ownership aside, the trial court erred in finding an easement by implication across Marshall's or any other defendant's parcel because there is no clear evidence that the federal government intended to reserve an easement for access. The parties dispute whether the record shows the government's intent to reserve an access easement. They focus on the use element of the cause of action. Plaintiffs argue the homesteaders' use is sufficient evidence; defendants counter that our focus should be on the government's actions. Again, *Murphy* controls.

21

The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties based on all of the facts and circumstances. (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1420.) However, courts must be particularly vigilant "when common ownership is traced back to a federal grant made without an express reservation for access." (*Murphy*, *supra*, 46 Cal.4th at p. 161.) "[C]onveyances involving a sovereign as the common owner *typically do not give rise to implied reservations of easements or other property interests in conveyed land*. [Citations.]" (*Id*. at p. 165, italics added.) "[T]he distinctive nature and history of federal land grants and the government's power of eminent domain" have made courts reluctant "to interfere with the certainty and predictability of land titles conferred by a sovereign without any express reservation of rights. [Citations.]" (*Id*. at pp. 161, 165, italics added.) Therefore, our Supreme Court instructs that "*extreme caution must be exercised* in determining whether the circumstances surrounding a government land grant are sufficient to overcome the inference prompted by the omission of an express reference to a reserved right of access. [Citation.]" (*Id*. at p. 167, italics added.) "[W]hen a claimant traces common ownership back to the federal government and seeks to establish an *implied reservation* of an access right-of-way, *the intent of Congress is paramount*" and the "easement claimant bears the burden of producing evidence on the issues regarding the government's intent to reserve an easement and the government's lack of power to condemn." (*Ibid.*, italics added.)

The patents here were issued pursuant to the federal Homestead Act. "The pertinent inquiry . . . is the intent of Congress when it granted land." (*Leo Sheep Co. v. United States* (1979) 440 U.S. 668, 681 [involving Union Pacific Railroad Charter Act of 1862, Act of July 1, 1862, 12 Stat. 489].) Plaintiffs have not pointed us to anywhere in the Homestead Act or its legislative history that mentions reservations of access easements.

The patents likewise are silent about access easements, as plaintiffs acknowledge. Normally, federal patents contain no express reservation of easements for access. (*Leo Sheep Co. v. United States*, *supra*, 440 U.S. at p. 687 ["Generations of land patents have issued without any express reservation of the right" for an access easement].) Here,

22

each patent explicitly "reserve[s] from the lands hereby granted a right of way thereon *for ditches or canals* constructed by the authority of the United States." (Italics added.) "Given the existence of such explicit exceptions, this [Supreme] Court has in the past refused to add to this list by divining some 'implicit' congressional intent." (*Leo Sheep Co. v. United States*, at p. 679.) The omission from the patents in this case of a reservation of a right-of-way for access compels the conclusion that the federal government had no intent to reserve an access easement on any trail or road that existed along Henry Ridge. (See *Hash v. U.S.* (2005) 403 F.3d 1308, 1314 [no patent mentions reserving to U.S. any title, ownership interest, or reversionary right in land underlying previously-granted railroad right-of-way].)

Plaintiffs argue that defendants had the burden to show an intent of Congress *not* to reserve a right of way. They quote *Horowitz v. Noble* (1978) 79 Cal.App.3d 120 that an easement will be implied unless the parties have expressed their intention to the contrary. (*Id*. at pp. 132-133.) *Horowitz* is inapplicable because the litigants there were private parties. Where, as here, the common owner is the sovereign whose patents did not expressly reserve access easements, the burden fell on *plaintiffs* as easement claimants to produce evidence about the government's intent. (*Murphy*, *supra*, 46 Cal.4th at p. 167.) Plaintiffs failed to carry their burden to adduce any evidence, let alone clear evidence, that Congress intended to reserve an access road in these patents.

The trial court's finding of an implied easement over Henry Ridge Motorway based on the federal patents resulted from its misapplication of the law with respect to common ownership, and plaintiffs adduced no "clear evidence" of Congressional intent to reserve an access easement. Thus, the portion of the judgment establishing an implied easement must be reversed.

We turn to the trial court's three bases for finding the roads were dedicated to public use: (1) the patent theory, and (2) implied in law and (3) implied in fact dedication.]]

[[End nonpublished portion]]

23

Dedication To Public Use

Defendants challenge the trial court's interpretation and application of Civil Code section 1009 in ruling that the two roads were dedicated to public use.

1. *The law of public dedication*

A dedication is the voluntary application of land " 'for some public use, made by the fee owner, and accepted by the public. By virtue of this offer which the fee owner has made, he is precluded from reasserting an exclusive right over the land now used for public purposes.' " (*Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 820-821 (*Blasius*); 10 Miller & Starr, Cal. Real Estate, *supra*, § 26:1, pp. 26-3 to 26-4.) "Dedications may occur pursuant to statute or the common law. [Citation.]" (*Blasius*, at p. 820.)

Common law dedications are either express or implied. Express dedication occurs when the landowner's intent to dedicate is manifested by overt acts, such as by an instrument. Implied dedication arises when, in the absence of overt acts, the evidence of the landowner's conduct or acquiescence supports the attribution of intent to dedicate. (*Blasius*, *supra*, 78 Cal.App.4th at p. 821.)

Dedications can be implied in law and implied in fact. A dedication is implied in law when the public's use is adverse and exceeds the period for prescription. (*Blasius*, *supra*, 78 Cal.App.4th at p. 821; *Cherokee Valley Farms, Inc. v. Summerville Elementary Sch. Dist.* (1973) 30 Cal.App.3d 579, 585 (*Cherokee*).) A dedication is implied in fact "when the period of public use is less than the period for prescription and the acts or omissions of the owner afford an implication of actual consent or acquiescence to dedication." (*Blasius*, at p. 821, citing *Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235, 241.)

In addition to an offer to dedicate, the record must show an acceptance by the public. (10 Miller & Starr, *supra*, § 26:1, p. 26-5; *Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 837.) Acceptance may also be express or implied. (*Baldwin*, *supra*.) An express acceptance is a formal acceptance by the proper authorities. Implied acceptance occurs when " 'the public has made use of the property for a period of time

24

which demonstrates an intention to accept dedication [citation] or where actions by the responsible public officials indicate[ ] an assumption of control over the property.' [Citation.]" (*Ibid.*) Courts require an "unconditional and unqualified acceptance of the offer" to dedicate. (10 Miller & Starr, *supra*, § 26:1, p. 26-5.)

The evidence required for finding that a road was impliedly dedicated to public use was delineated in *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29 (*Gion*). Under *Gion*, "[w]hat must be shown is that persons used the property believing the public had a right to such use. This public use may not be 'adverse' to the interests of the owner in the sense that the word is used in adverse possession cases. If a trial court finds that the public has used land without objection or interference for more than five years, it need not make a separate finding of 'adversity' to support a decision of implied dedication." (*Id*. at p. 39.)

As for the type of use, those advocating implied public dedication must demonstrate that people have "used the land as they would have used public land." (*Gion*, *supra*, 2 Cal.3d at p. 39.) Proponents of implied public dedication must show that "various groups" of people "have used the land," not merely "a limited and definable number of persons." (*Ibid.*) " '[T]he thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners.' [Citation.]" (*Id*. at p. 40.) Therefore, the use must be "substantial, diverse, and sufficient, considering all the circumstances, to convey to the owner notice that the public is using the passage as if it had a right so to do." (*Blasius*, *supra*, 78 Cal.App.4th at p. 826, fn. 7.)

Whether there has been a dedication for public use is a factual question. (10 Miller & Starr, Cal. Real Estate, *supra,* § 26:4, p. 26-11; *Cherokee*, *supra*, 30 Cal.App.3d at p. 585.) Whether express or implied, "the fundamental requirement for dedication is the *clear and unequivocal intent* by the property owner to dedicate his or her property [for] public use" (10 Miller & Starr, *supra*, at p. 26-9) and the unconditional and unqualified acceptance of that offer. (*Id*., § 26:1, p. 26-5.)

*2. Civil Code section 1009 prevents all public use after 1972, not just recreational use, from ripening into an implied dedication to public use, and thus the trial court's interpretation and application of that statute was legal error.*

On the heels of *Gion*, the Legislature enacted Civil Code section 1009, effective March 4, 1972 to prospectively abrogate that decision. (*Blasius*, *supra*, 78 Cal.App.4th at pp. 822-823.)[9] Subdivision (a) of section 1009 is a statement of the Legislature's findings that "[i]t is in the best interests of the state to encourage owners of private real property to continue to make their lands available for public recreational use;" that landowners face the "threat of loss of rights in their property if they allow . . . the public to use, enjoy or pass over their property for recreational purposes;" and that the "stability and marketability of record titles is clouded by such public use, thereby compelling the owner to exclude the public from his property." (Civ. Code, § 1009, subd. (a).)

Subdivision (b) of Civil Code section 1009 declares that, notwithstanding lack of Civil Code sections 813 and 1008 notices [that use is permissive] by "a private owner of real property," "*no use* of such property by the public after the effective date of this section *shall ever ripen to confer upon the public* or any governmental body or unit *a vested right* to continue to make *such use* permanently, in the absence of an express written irrevocable offer of dedication of such property to such use, made by the owner thereof in the manner prescribed in subdivision (c) of this section, which has been accepted by the county, city, or other public body to which the offer of dedication was made . . . ." (Civ. Code, § 1009, subd. (b), italics added.)[10]

---

[9]  The Legislature also amended Civil Code section 813. (*Blasius*, *supra*, 78 Cal.App.4th at p. 822.) That statute now provides that a recorded notice of the landowner's consent to public use for a described purpose constitutes conclusive evidence that subsequent use of the land is permissive. (See *Blasius*, at pp. 822-823.)

[10]  Civil Code section 1009 reads in relevant part, "(a) The Legislature finds that: [¶] (1) It is in the best interests of the state to encourage owners of private real property to continue to make their lands available for public recreational use to supplement opportunities available on tax-supported publicly owned facilities. [¶] (2) Owners of private real property are confronted with the threat of loss of rights in their property if

26

Subdivision (e) exempts coastal property, not at issue here, from subdivision (b). Subdivision (f) sets forth the steps that a coastal landowner may take to prevent the public use of coastal property from being used as evidence to support an implied

they allow or continue to allow members of the public to use, enjoy or pass over their property for recreational purposes.  [¶]  (3) The stability and marketability of record titles is clouded by such public use, thereby compelling the owner to exclude the public from his property.

"(b) Regardless of whether or not a private owner of real property has recorded a notice of consent to use of any particular property pursuant to Section 813 of the Civil Code or has posted signs on such property pursuant to Section 1008 of the Civil Code, except as otherwise provided in subdivision (d), no use of such property by the public after the effective date of this section shall ever ripen to confer upon the public or any governmental body or unit a vested right to continue to make such use permanently, in the absence of an express written irrevocable offer of dedication of such property to such use, made by the owner thereof in the manner prescribed in subdivision (c) of this section, which has been accepted by the county, city, or other public body to which the offer of dedication was made, in the manner set forth in subdivision (c).  [¶] . . . [¶]

"(e) Subdivision (b) shall not apply to any coastal property which lies within 1,000 yards inland of the mean high tide line of the Pacific Ocean, and harbors, estuaries, bays and inlets thereof, but not including any property lying inland of the Carquinez Straits bridge, or between the mean high tide line and the nearest public road or highway, whichever distance is less.

"(f) No use, subsequent to the effective date of this section, by the public of property described in subdivision (e) shall constitute evidence or be admissible as evidence that the public or any governmental body or unit has any right in such property by implied dedication if the owner does any of the following actions:  [¶]  (1) Posts signs, as provided in Section 1008, and renews the same, if they are removed, at least once a year, or publishes annually . . . in a newspaper of general circulation in the county or counties in which the land is located, a statement describing the property and reading substantially as follows: 'Right to pass by permission and subject to control of owner: Section 1008, Civil Code.'  [¶]  (2) Records a notice as provided in Section 813.  [¶] (3) Enters into a written agreement with any federal, state, or local agency providing for the public use of such land.  [¶]  After taking any of the actions set forth in paragraph (1), (2), or (3), and during the time such action is effective, the owner shall not prevent any public use which is appropriate under the permission granted pursuant to such paragraphs by physical obstruction, notice, or otherwise.

"(g) The permission for public use of real property referred to in subdivision (f) may be conditioned upon reasonable restrictions on the time, place, and manner of such public use, and no use in violation of such restrictions shall be considered public use for purposes of a finding of implied dedication."

27

dedication to the public, such as posting signs, recording Civil Code section 813 notices, or entering into an agreement with a governmental agency providing for the public use of the land. (Civ. Code, § 1009, subd. (f)(1)-(3).)

Here, the trial court ruled that Civil Code section 1009 prevents only *recreational* use of property from developing into a permanent vested right. Based on its statutory interpretation, the court relied on evidence of public vehicular ingress and egress after March 4, 1972 to find that Henry Ridge Motorway and Gold Stone Road were impliedly dedicated as public streets. Defendants contend that the trial court erred as a matter of law. They read Civil Code section 1009, subdivision (b) to preclude all use, not simply recreational use, of private property from ever ripening into public dedications by implication after the statute's enactment.

What Civil Code section 1009 precludes is an issue of statutory construction. "Statutory construction is a question of law that courts review de novo. [Citation.] The judicial task in construing a statute is to ascertain and effectuate the legislative intent . . . . [Citations.] The words of the statute are given their ordinary and usual meaning and are construed in the context of the statute as a whole and the entire system of law of which it is a part. [Citations.] A court must harmonize a statute with other laws so as to give effect to all and avoid anomalies, if possible. [Citations.]" (*Bostick v. Flex Equipment Co., Inc*. (2007) 147 Cal.App.4th 80, 108 (concurring opn. of Croskey, J.).)

"If the language of a statute is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine the legislative . . . intent. [Citation.] If the statutory language does not yield a plain meaning, a court may consider extrinsic indicia of intent, including the legislative history of a statute enacted by the Legislature . . . and the historical circumstances of the statute's enactment. [Citations.] 'Finally, the court may consider the impact of an interpretation on public policy, for "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." [Citation.]' [Citation.]" (*Bostick v. Flex Equipment Co*., *Inc*., *supra*, 147 Cal.App.4th at p. 108 (concurring opn. of Croskey, J.).)

28

Looking to the words of the statute, we conclude Civil Code section 1009 is not ambiguous. Subdivision (b) of Civil Code section 1009 bars *all* public use, not just recreational use, from developing into an implied public dedication. Subdivision (b) broadly declares that "no use" – not "no *recreational* use" – shall "*ever*" ripen into a vested right in the public, absent a written offer. " '[W]hen one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning.' [Citations.]" (*Klein v. United States of America* (2010) 50 Cal.4th 68, 80.) The absence of the word "recreational" from the phrase "no use" in subdivision (b) indicates that the Legislature's aim was to comprehensively preclude implied public dedications from arising from *any kind of* public use of private real property.

*Pulido v. Pereira* (2015) 234 Cal.App.4th 1246, concluded otherwise. *Pulido* stated that "use of such property" in subdivision (b) of Civil Code section 1009 "refers back to subdivision (a)(1), which explains that the subject of the statute is the public recreational use of private real property." However, subdivision (b) of Civil Code section 1009 defines the property to which it refers. The first clause of subdivision (b) reads "Regardless of whether or not a *private owner* of *real property* has recorded a notice of consent to use of *any particular property* pursuant to Section 813 of the Civil Code or has posted signs *on such property* pursuant to Section 1008 of the Civil Code . . . ." (Italics added.) The second clause of the same sentence declares, "no use of *such* property . . . shall ever ripen to confer" a vested right in the public by implication. (Italics added.) Reference back to subdivision (a) to define the type of property discussed in subdivision (b) is unnecessary because the operative sentence of subdivision (b) contains its own definition, namely "any particular" private property.

Indeed, nowhere in the operative provisions of the statute is the word "recreational" found; "recreational" is only employed in the legislative findings in subdivision (a) of Civil Code section 1009. "Legislative findings and statements of purpose in a statute's preamble can be illuminating if a statute is ambiguous. [Citation.] But a preamble is not binding in the interpretation of the statute." (*Yeager v. Blue Cross*

29

*of California* (2009) 175 Cal.App.4th 1098, 1103, fn. omitted.) As noted, no ambiguity exists in the statute and so it is unnecessary to import the word "recreational" from the legislative findings into the operative portions of the statute when the Legislature has declined to do so. The Legislature clearly intended Civil Code section 1009 to have broader application than solely to recreational use.[11]

Viewing the statute as a whole (*Bostick v. Flex Equipment Co., Inc., supra*, 147 Cal.App.4th at p. 107 (conc. opn. of Croskey, J.)), reinforces our conclusion. Subdivisions (e) and (f) of Civil Code section 1009 treat coastal property differently than non-coastal land by exempting coastal property from the subdivision (b) comprehensive ban on implied dedication. Coastal land remains subject to the implied dedication doctrine. To prevent evidence of public use of coastal land from supporting a finding of implied public dedication, an owner must affirmatively act by taking one of the three steps listed in subdivision (f). "[C]ourts must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous. [Citations.]" (*Klein v. United States of America*, *supra*, 50 Cal.4th at p. 80.) A construction of subdivision (b) to ban only recreational use from ripening into a permanent vested public right would eliminate the statute's disparate treatment of coastal and non-coastal land.

---

[11] We disagree with the dicta to the contrary in *Bustillos v. Murphy* (2002) 96 Cal.App.4th 1277. After reciting the legislative intent to encourage recreational use in Civil Code section 1009, subdivision (a), *Bustillos* stated, "The statute effectuates this purpose by providing that *no recreational use of private property* 'shall ever ripen to confer upon the public . . . a vested right to continue to make such use permanently' unless the property owner dedicates the land to public use and the dedication of property is accepted by the government. (*Id*., subd. (b).)" (*Bustillos v. Murphy,* at pp. 1280-1281, italics added.) *Bustillos* inserted the word "recreational" into its reading of subdivision (b) of Civil Code section 1009 where that word does not actually exist in contravention of the rule that "[w]e may not make a silent statute speak by inserting language the Legislature did not put in the legislation. [Citation.]" (*Yeager v. Blue Cross of California*, *supra*, 175 Cal.App.4th at p. 1103.)

Although we conclude that subdivision (b) of Civil Code section 1009 clearly applies to all uses of private property, we recognize that other cases have interpreted that section to apply only to recreational uses. (*Pulido v. Pereira*, *supra*, 234 Cal.App.4th at p. 1252 [statute is arguably ambiguous]; *Bustillos v. Murphy*, *supra*, 96 Cal.App.4th at pp. 1280-1281 [statute's aim is clear]; *Hanshaw v. Long Valley Road Assn.* (2004) 116 Cal.App.4th 471.) Looking then to the Legislature's intent, it reinforces our construction. The Supreme Court in *Gion* clarified well-settled principles of implied dedication to the public for recreational purposes in a coastal area. (*County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 213.) With the passage of section 1009, the Legislature adjusted the effect of *Gion* on land along the coast, and precluded all post-1972 public use of non-coastal private property from ripening into public dedication by implication. (See Civ. Code, § 1009, subds. (b) & (e).) The Legislature expressly designed Civil Code section 1009 to "*treat the effect of implied dedication differently* in the coastal zone than in the remainder of the state." (Assem. Com. on Planning and Land Use, Analysis of Proposed Amendments to Sen. Bill No. 504, (1971 Reg. Sess.) July 20, 1971, p. 1, italics added.)[12] With passage of section 1009, "[t]*he doctrine of implied dedication would be deleted prospectively except for the 'coastal zone' . . . .*" (*Ibid.*, italics added.) More important, the statute was written to "[p]rohibit[] *any use* of private land, except specified ocean frontage land, after [the] effective date of [the] act *from conferring a vested right in* [*the*] *public* . . . in [the] absence of [an] express written irrevocable offer [to dedicate made] by owner of [the] property accepted by specified public agenc[ies]. With regard to

---

[12]   We grant the July 6, 2012 request of Erickson/Malick, joined by Burke and Marshall, to take judicial notice of the legislative history of Civil Code section 1009. Plaintiffs oppose the request on the ground these documents were not before the trial court. However, the construction of a statute presents a purely legal question that we review independently. (*Audio Visual Services Group, Inc. v. Superior Court* (2015) 233 Cal.App.4th 481, 489; see *Peart v. Ferro* (2004) 119 Cal.App.4th 60, 81, citing Evid. Code, §§ 452 & 459 [taking judicial notice of legislative history notwithstanding respondents' opposition on ground it was not introduced in trial court].)

Defendants' request, filed on July 6, 2012, to take judicial notice of exhibits I and J is denied.

31

specified ocean frontage property, [section 1009] makes use by public inadmissible to prove implied dedication *if* specified actions are taken by owner." (Legis. Counsel's Dig., Sen. Bill. No. 504 (1971 Reg. Sess. & 1971 1st Ex. Sess.) Summary Dig., p. 136, italics added; accord, Enrolled Bill Memorandum to Governor for Sen. Bill. No. 504 (1971 Reg. Sess.) Oct. 7, 1971, p.1; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1169-1170 [Legislative Counsel' summary are entitled to great weight].) As shown, the express legislative purpose of Civil Code section 1009 is to encourage recreational use of private property by preventing implied dedication of coastal property based on public use if the landowner takes one of the specified steps in subdivision (f), while *eliminating* all *implied* dedication of non-coastal property to public use after March 1972.

A contrary construction of Civil Code section 1009 undermines the Legislature's findings and purpose, namely "to encourage owners of private real property to continue to make their lands available for public recreational use" by enabling property owners to allow recreational use of their land without fear of risking a cloud on their title. (Civ. Code, § 1009, subd. (a).) To read subdivision (b) to apply only to recreational use would discourage non-coastal landowners, unable to distinguish between recreational and nonrecreational users, from allowing any entry on their inland property for fear that "non-recreational" use would become permanent. Such a result would improperly thwart the statute's declared purpose and return the law to the state it was under *Gion*, thus defeating the Legislature's motive for enacting the statute.

The trial court followed *Hanshaw v. Long Valley Road Assn.*, *supra*, 116 Cal.App.4th 471, to find that Civil Code section 1009 only precluded common law dedications to public recreational use, but not to other uses such as vehicular ingress and egress. *Hanshaw* rejected the landowner's argument that Civil Code section 1009 prevented application of a common law public dedication theory after 1972 in a case involving implied public dedication of an access road. Relying on the phrase "for recreational purposes" in the subdivision (a)(2) legislative findings, the *Hanshaw* court held that the statute applies only to preclude the ripening of *recreational* use into a public

32

dedication. (*Hanshaw*, at pp. 484-485.) We decline to follow *Hanshaw* because it ignored the interplay of all of the statute's subdivisions and limited subdivision (b)'s broad prohibition that "*no use*" "*shall ever* ripen to confer upon the public" a vested right to continue the use. (Civ. Code, § 1009, subd. (b), italics added; *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1489, fn. 10 [we are not bound by the contrary decision by another appellate court; " 'there is no "horizontal stare decisis" within the Court of Appeal' "].)

For the foregoing reasons, Civil Code section 1009, subdivision (b) bars all use of private real property after March 1972, not just recreational use, from ripening into a public dedication absent an express, written, irrevocable offer of such property to such use, made according to subdivision (c).[13]

Here, to find implied dedication of the two roads to public use for vehicular access, the trial court relied on witness testimony and recent photographs. Under Civil Code section 1009, subdivision (b), none of the testimony is admissible as all of it concerned vehicular use of Henry Ridge Motorway and Gold Stone Road between the late 1970s and the first decade of the 21st century. No witness testified about using or seeing anyone else use these roads for vehicular access before March 1972. Even the Matriarch of Henry Ridge, Stewart, only moved to Henry Ridge Motorway in 1977. Although Stewart testified that the roads "have been used for fifty years," this testimony does not begin to describe the number and variety of use that *Gion* and *Blasius* require to find an implied dedication to public use. (*Gion*, *supra*, 2 Cal.3d at pp. 39-40; *Blasius*, *supra*, 78 Cal.App.4th at pp. 825-826, fn. 7.) Also, Stewart admitted that she had no personal knowledge of anyone driving Gold Stone Road to Henry Ridge Motorway.

---

[13] The Los Angeles County Fire Department's maintenance of the road until 1984 is not admissible evidence of acceptance by the County of a dedication to public use. (Civ. Code, § 1009, subd. (b).) Not only does the record lack evidence of an express, written, irrevocable offer to the County, but the County ceased maintaining Henry Ridge Motorway because it was a private road.

The trial court additionally cited the express irrevocable offers to dedicate trail easements, which were executed after 1972, as evidence that Marshall, and the predecessors of the Schroders and Erickson/Malicks impliedly devoted these two roads to the public as vehicular thoroughfares. An exception to the ban on post-1972 implied dedications occurs when the landowner records an express, written, and irrevocable offer to dedicate that is accepted by a governmental entity. (Civ. Code, § 1009, subd. (b).) We independently construe these instruments which were executed after 1972. (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238.)

The landowners' express dedication in these documents was for a "*hiking and equestrian trail*" a "*trail* easement," and a "public access *trails* easement . . . *limited to hiking and equestrian uses only*." (Italics added.) The latter dedication was also limited to daylight hours. Nothing could be more manifest: Marshall and the predecessors of the Schroders and Erickson/Malicks made irrevocable offers to dedicate easements for trail purposes only; there is nothing in the trail dedications indicating the intent to devote the portions of the trail on their property that coincides with Henry Ridge Motorway or Gold Stone Road as public streets. The express dedication of property for public use for horses and pedestrians alone does not result in implied dedications of the same land as a street for cars. (*California etc. Co. v. Union etc. Co*. (1899) 126 Cal. 433, 437 [express dedication of land for highway does not establish dedication of property for landing and wharves]; 26 Cal.Jur.3d (2008) Dedication, § 23, p. 46.) Thus, these instruments do not dedicate public roads for the unlimited vehicular access at anytime of the day and night that plaintiffs seek.

Nor is the witness testimony about *vehicular* ingress and egress for general purposes after 1972 admissible to transform the express offer of a trail for public use into a dedication of the roads as public streets. (Civ. Code, § 1009, subd. (b).) The Coastal Commission reports attached to the trail dedications require no more than public access for recreational purposes. The reports cite Public Resources Code sections 30210 through 30212, which concern *access* to the sea for recreational purposes and the findings are replete with references to public access to the Topanga-Henry Ridge Trail. More

34

important, the reports reflect a concern about the "perception by the public that the areas involved are private" and a " 'feeling of trespass,' " contradicting the requirement of *Gion* that people must use the roads "believing the public had a right to such use." (*Gion*, *supra*, 2 Cal.3d at p. 39.)

Finally, the trial court ruled that defendants' acts of erecting gates and posting signs were in response to the "continued heavy use of Henry Ridge Motorway and Gold Stone Road by the public." While that may be, no use of private inland property may ripen into a permanent, vested, public right after 1972 "[r]egardless of whether or not a private owner of real property has recorded a notice of consent . . . pursuant to Section 813 of the Civil Code or has posted signs on such property pursuant to Section 1008 of the Civil Code." (Civ. Code, § 1009, subd. (b).)

The trial court erred in relying on post-1972 evidence of public use, and the record contains no express, written, irrevocable offer to dedicate the subject roads as public thoroughfares.

[[Begin nonpublished portion]]

[[Turning to pre-1972 use, as explained, the photographs that predate 1972 show that the Topanga area was developing, but none shows development along Henry Ridge Motorway. Rather, all of the sites depicted on the maps from before 1972 are connected to roads other than Henry Ridge Motorway. Thus, these photographs do not give rise to a reasonable inference that the road was used during those years.

The trial court also cited the 1949 Easement, as well as the 1968 and 1970 Declarations as constituting offers to "dedicate these streets or other areas for public use" because these instruments used the word "dedicate" or evinced an intent to dedicate. The court quoted from *Hays v. Vanek* (1989) 217 Cal.App.3d 271, that " 'Dedicate' is a term of art with a particularized legal meaning. [Citation.] It is highly unlikely [the grantor] would have used the word in the . . . deed had he not intended the road to be a public road." (*Id*. at p. 282.)

However, resolution of this issue requires construction of the documents, and the interpretation of deeds and other instruments is solely a judicial function unless the

35

interpretation turns on the credibility of extrinsic evidence. (*City of Manhattan Beach v. Superior Court, supra*, 13 Cal.4th at p. 238.) Upon inspection, none of the instruments cited by the trial court effectuated a dedication of Henry Ridge Motorway or Gold Stone Road to the public, their use of the word "dedication" in the titles notwithstanding. Although the grantors desired to subdivide and to provide the new parcels with access to a public street, each of the documents explicitly declared "appurtenant" "easements for road purposes" with the proviso that *if* final tract maps were recorded dedicating public streets, or in the case of the 1949 Easement the state or county *accepted* it as a public road, *then* the easements would no longer be effective. When a dedication is conditional, the conditions precedent must occur or the offer is inoperative. (*Cal. Water & Tel. Co. v. Public Util. Com.* (1959) 51 Cal.2d 478, 495.) The conditions in these instruments were never satisfied: the "said map[s]" attached to the 1968 and 1970 Declarations are not final tract maps;[14] no acceptance was recorded for any of these instruments; and no testimony was introduced about public use before 1972 such as would constitute implied acceptance. Thus, neither the 1949 Easement, the 1968 Declaration, nor the 1970 Declarations constitutes a dedication of Henry Ridge Motorway and Gold Stone Road to use as public streets.

The trial court also found that the quad maps showed the two subject roads existing in the same place they do today, and ruled that the roads' very existence evinced an intent to dedicate them to the public. However, "the mere fact that a public map shows land to be laid out as a street is not evidence, in itself, of the owner's dedication of the land." (26 Cal.Jur.3d, *supra*, § 73, p. 307.) The simple placement on a map cannot constitute a dedication as a public road or there would be no private roads. Thus, if public dedication is claimed based on recorded maps, the evidence must show the

---

[14]    The trial court was influenced by the legend on the maps attached to two of the 1970 Declarations which identified a line as indicating "Dedicated roads per attached declaration." Such a legend does not create a dedication to public use where the express conditions for the dedication were never satisfied. (*Cal. Water & Tel. Co. v. Public Util. Com.*, *supra*, 51 Cal.2d at p. 495.)

landowner's clear and unequivocal intent to so dedicate. (*Ibid.*) We are mindful that "it is not a trivial thing to hold that private property has been dedicated to public use. [Citations.]" (*Hays v. Vanek*, *supra*, 217 Cal.App.3d at p. 281.) There is no evidence that the roads identified on the quad maps were actually adversely used by, or accepted by, the public according to *Gion*, *supra*, 2 Cal.3d at page 39. Under the circumstances, none of the instruments or maps cited by the trial court constitutes "clear and unequivocal proof" of an implied in law dedication of Henry Ridge Motorway or Gold Stone Road to the public.

3. *There is no evidence to support the trial court's dedication theory based on the patents*.

The trial court ruled that Henry Ridge Motorway and the portion of Gold Stone Road that lies on the Burkes' property where it connects with Greenleaf Canyon Road were dedicated to public use before 1902, the date of the first patent, while the land was still held by the federal government. For this finding, the court relied on section 2477, United States Revised Statutes, title 43 United States Code former section 932 (July 26, 1866), 14 Stat. 2521, repealed by Pub.L. No. 94-579 (Oct. 21, 1976), 90 Stat. 2793 (RS 2477). Defendants contend this finding was error.

Enacted in 1866, RS 2477 read, " 'The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted.' " (*Ball v. Stephens* (1945) 68 Cal.App.2d 843, 846 (*Ball*).) " 'The object of the grant was to enable the citizens . . . to build and construct such highways across the public domain as the exigencies of their localities might require, without making themselves liable as trespassers.' [Citation.]" (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 295 (*Western Aggregates*).) Under RS 2477, if a *public road existed* on the date the homesteader took title, the patented land was taken subject to that road. (See *Ball*, *supra*, at p. 850.)

To determine whether an existing road was public, RS 2477 referred to applicable state law governing dedications. (*Western Aggregates*, *supra*, 101 Cal.App.4th at p. 296; cf. *Ball*, *supra*, 68 Cal.App.2d at p. 846 [describing the law of RS 2477 as requiring

37

"evidence of public use of the described route as a roadway"].)  In California between 1883 and 1935, a road was deemed public if built by the government or "dedicated or abandoned to the public . . . ."  (*Ball*, at p. 846, quoting from Pol. Code, former § 2618.)

RS 2477 constituted the offer of dedication in California.  (*Western Aggregates*, *supra*, 101 Cal.App.4th at pp. 296, 298.)  Acceptance could be implied by the conduct of the public according to California's law of dedication.  (*Ibid.*, citing *Ball*, *supra*, 68 Cal.App.2d at p. 846.)  As explained, proof of public use sufficient to constitute acceptance for purposes of RS 2477 involves a substantial, diverse use of the land as public land would be used, by "various groups" of people for five years.  (*Gion*, *supra*, 2 Cal.3d at pp. 39-40; *Blasius*, *supra*, 78 Cal.App.4th at p. 826, fn. 7.)  The period of acceptance by use ended when the homesteader entered the land.  (*Knapp v. Alexander Co*. (1915) 237 U.S. 162, 167; *United States v. Clarke* (9th Cir. 1976) 529 F.2d 984, 986.)[15]

In *Ball*, cited by the trial court here, the evidence was that "the road was well defined and had been made so by public use."  Witnesses testified about the transition of the route from a trail to a road suitable for automobiles and trucks.  (*Ball*, *supra*, 68 Cal.App.2d at pp. 847-848.)  There was also evidence that "many people used the road

---

**15**      *Ball* stated that the period of acceptance by use ended when the patent was issued, i.e., five years after the homesteader's entry.  (*Ball*, *supra*, 68 Cal.App.2d at pp. 847-848.)  However, defendants convincingly argue that acceptance by use ended when a homesteader *entered* the land.  Once a homesteader entered the land under the Homestead Act, the land was no longer public because "entry for purposes of homesteading . . . separated the land from the public domain."  (*United States v. Clarke, supra,* 529 F.2d at p. 986.)  The United States Supreme Court explained that upon entry, the homesteader had a "preferential" or inchoate right to the land and once he fulfilled the conditions of the Homestead Act, "and receive[d] a patent vesting in him the complete legal title, this title relates back to the date of the initiatory act, so as to cut off intervening claimants."  (*Knapp v. Alexander Co*., *supra*, 237 U.S. at p. 167.)  Thus, the period of acceptance of an RS 2477 offer to dedicate ended upon the homesteader's entry and not, as *Ball* stated, "when the patent was issued."  (*Ball*, *supra*, 68 Cal.App.2d at pp. 847-848.)  Plaintiffs unpersuasively reject this limitations argument derived from United States Supreme Court authority, by noting that *Ball*, a state appellate court decision, states otherwise.  Even under *Ball*'s limitations period, the result here is the same.

38

for different purposes" such as "hunters, miners and vacationists. About 1905 numerous mining claims were located above the land defendant homesteaded and the locality attracted the attention of oil operators. A derrick was erected and work was done on a well which was located more than a mile from the land in question . . . . Materials and supplies were hauled to the well by a route which followed another canyon, but the trail leading down from the vicinity of the well toward defendant's land was made into a road over which a two-horse wagon could pass." This "[t]ravel was not merely occasional." (*Id*. at pp. 848-849.) The evidence was sufficient to affirm the finding that the road was public. (*Id*. at p. 845.)[16]

Here, the relevant evidence is that which shows *public* use of Henry Ridge Motorway, and that portion of Gold Stone Road which connects with Greenleaf Canyon Road, for five years before 1897 when the homesteader must have entered the Erickson/Malick north land. The record is devoid of any such evidence.

The trial court first cited the 1895 survey plat as evidence of public use. That survey depicts a "Road." The trial court "inferred that it would not have been designated as a road where the current location of Henry Ridge Motorway exists absent use." This is not a legally permissible inference: The mere existence of a road on a map does not show its *use was public*. "Whether it also became a public street did not depend upon the fact alone that the land appears on these maps as a public street, but whether the proof showed that it had been offered for dedication, and accepted as such by user or otherwise." (*Whelan v. Boyd* (1892) 93 Cal. 500, 501; accord, *Hays v. Vanek*, *supra*, 217 Cal.App.3d 271, 281 [declining to infer *public* use from mere designation of road as " 'first class' " on map; "such use is just as consistent with private easements by prescription or necessity or with implied private licenses as with public dedication"].) If mere existence on a map were sufficient evidence of intent to dedicate a road to the

---

[16] Plaintiffs are wrong when they argue that the description of use in *Ball* was meant to show the evolution of the subject road. *Ball* distinguished the evidence predating the patent from the post-patent evidence, noting that only evidence of the former was relevant to a dedication finding. (*Ball*, *supra*, 68 Cal.App.2d at pp. 848-850.)

public, then all roads depicted on all maps would be impliedly dedicated to public use rendering the "use" requirement a nullity. The 1895 survey plat is not evidence of use.

The trial court inferred public use from the fact that patentees "and others" used the "Road" for five years to meet the requirements of the Homestead Act. Yet, there is no evidence of "others." Plaintiffs' expert Stanley acknowledged that the only evidence of use was an *inference* from the fact of the homesteaders' patents that those homesteaders "used this road to get access." Homesteaders alone do not constitute a "various group" or "diverse" use by the public as required by *Gion* and *Blasius*, and do not amount to the same assortment of users cited as sufficient in *Ball*. Also, the record contains evidence of fewer than a dozen patentees along Henry Ridge Motorway, which is a "limited and definable number of persons" and hence an insufficient amount. (*Gion*, *supra*, 2 Cal.3d at p. 39.) Moreover, a private homesteader's use for the purposes of obtaining fee title to the land by patent cannot also constitute public use that would divest the same homesteader of his rights to that same land. (See, e.g., *United States v. Clarke*, *supra*, 529 F.2d at p. 986.) For these reasons, the patentees are not evidence of public use.

There is also insufficient evidence to support the trial court's finding that the part of Gold Stone Road at the Burkes' driveway and Greenleaf Canyon Road was part of the "Road" in 1895 that later became Henry Ridge Motorway. "[W]e uphold the findings if supported by substantial evidence. [Citations.]" (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1417.) However, "[a] decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason . . . ; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' [Citation.]" (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393-1394.)

The trial court here relied on two maps, neither of which supports the court's finding that before 1902, Henry Ridge Motorway was connected to what is now Gold Stone Road. The first map was a composite created by Stanley who admitted her creation did not show the 1895 "Road" connecting to Greenleaf Canyon Road, and who

40

testified only that "*depending* on *how accurate* this map is, [it shows a road] *possibly* also going over a portion of the land owned by Burke." (Italics added.) This is rank speculation. The second map the court cited was created by MacNeil, who testified he derived it from 1930s CSB maps which reflect potential as well as existing road alignments. More important, he testified that it was "never established that it was [Henry Ridge] Motorway all the way to [Greenleaf Canyon Road]." Thus, the court had no solid evidence on which to find that the Burkes' portion of Gold Stone Road was once part of the 1895 "Road."

Finally, none of the other evidence relied on by the trial court is substantial, and all of it postdates 1902. For instance, the 1908 map depicts a post office, two taverns, and a house. The map is too recent, and all of the sites listed thereon are located on roads *other than* Henry Ridge Motorway. Similarly, none of Stanley's photographs shows use on Henry Ridge Motorway. Indeed, the 1895 survey plat and Stanley's testimony only confirm that the 1895 "Road" did not connect to any destination-point, while there were other roads leading to the Section 1 and Section 7 patents. Considering all of the evidence adduced here, it amounts to the mere fact that a road existed on the 1895 survey plat and may have been used by a handful of homesteaders whose entry cut off public use. These facts are insufficient as a matter of law to constitute a public acceptance of the RS 2477 offer.[17] Therefore, the trial court erred in ruling that Henry Ridge Motorway and a portion of Gold Stone Road were impliedly dedicated to the public based on RS 2477.

The portion of the judgment declaring Henry Ridge Motorway and Gold Stone Road dedicated to public use must be reversed.[18]

---

[17] The Los Angeles County Fire Department's maintenance of the road is not evidence of acceptance by the County of a dedication to public use. The County maintained the road after 1902.

[18] As the result of our conclusion here that the portion of the judgment finding implied easement and implied dedication to public use must be reversed, we need not address defendants' additional contentions on appeal.

41

## II

## PLAINTIFFS' APPEAL

1. *No express easement*

Plaintiffs contend that the trial court erred as a matter of law in ruling that plaintiffs had failed to establish they had an express easement based on the 1968 and 1970 Declarations.

Quoting from the express language of the 1968 and 1970 Declarations, these instruments state that the grantors "hereby grant said easements to all owners, their heirs, successors and assigns in [Sections 12 and 1, respectively] as said owners' fee interest appear of record, *the vesting of title to said easements to take effect upon recording* in the office of the County Recorder by any fee owner of a portion of said Sec. [12 and 1, respectively] *of an acceptance of said easements*." (Italics added.) There is no evidence that acceptances were ever recorded.

Notwithstanding these instruments' clear requirement of a *recorded acceptance*, plaintiffs contend the law does not require an acceptance and so that requirement is "repugnant to the grant itself." Citing Stanley's opinion testimony, plaintiffs also argue such "language was immaterial to the express grant of easement rights."

Interpretation of these instruments is solely a judicial function unless it turns on credibility of extrinsic evidence. (*City of Manhattan Beach v. Superior Court*, *supra*, 13 Cal.4th at p. 238.) "Opinion testimony is inadmissible and irrelevant to adjudging questions of law. [Citations.]" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 266.) The instruments' requirement of a recorded acceptance is clear and unassailable and so Stanley's opinion is irrelevant. We cannot idly dismiss the acceptance language. Future owners rely on the express language of the grants for certainty. It is undisputed that no such acceptance of the easements in the 1968 and 1970 Declarations was recorded. Therefore, the trial court did not err in ruling that plaintiffs had not proven their right to an access easement by express grant.

## 2. *No easement by prescription*

Plaintiffs contend the trial court erred in ruling they did not establish an easement for ingress and egress across Henry Ridge Motorway and Gold Stone Road by prescription. The prescriptive period is an uninterrupted five years. (*Warsaw v. Chicago Metallic Ceilings, Inc*. (1984) 35 Cal.3d 564, 570-571.) "[A] party seeking to establish a prescriptive easement has the burden of proof by clear and convincing evidence. [Citation.]" (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304, 1310.) The court ruled, "As to the Prescriptive Easement, the Court's concern is that it could not determine the exact 5 year period necessary to meet the elements."

The evidence is disputed. Scher testified he used the roads 1,400 times between 1998 and 2005. Plaintiff McAllister testified she used the road 6-14 times per week during this same period. In contrast, a witness who lived on the Schroders' property between 1993 and 2005 did not believe these claims "for a moment." Another resident on the Schroders' property testified that the claimed use of "200 times per year" was impossible given that that resident watched the property carefully beginning in 1991 and turned people back. The Schroders never saw Scher or McAllister drive along Gold Stone Road. Erickson saw Scher "twice in the 20 years that I've been there" and simply did not think it was possible that McAllister used the road as often as she claimed. Malick never saw either plaintiff use the subject roads. Marshall and the Burkes acknowledged only that they saw "people" on the roads.

Plaintiffs argue the record contains adequate evidence of their use for the prescriptive period because the trial court found earlier in its statement of decision: "Here, until 2006, the continuous, unobstructed and unimpeded use of Henry Ridge Motorway and [Gold Stone] Road by Plaintiffs, *other residents, the Defendants themselves, strangers, delivery drivers, workers, motorcyclists, lookie-loos, and teenagers, among others*, constitutes sufficient *public use* to accept the implied dedication of the roads." (Italics added.) This statement is irrelevant because it was made in conjunction with the trial court's finding of an implied dedication to use by the *public*, which requires a diverse collection of users. The statement does not segregate

43

plaintiffs' use.  By contrast, in declining to find a prescriptive easement, the trial court found that *plaintiffs'* use was not continuous for five years.

Plaintiffs filed no objections to the statement of decision and so the doctrine of implied findings applies.  "The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. [Citation.]"  (*Fladeboe v. American Isuzu Motors Inc*. (2007) 150 Cal.App.4th 42, 58.) Parties must "point out deficiencies in the trial court's statement of decision as a condition of avoiding [the doctrine of] implied findings."  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134.)  Under the doctrine of implied findings, where the evidence is in dispute, we must infer that the court did not believe plaintiffs' assertion that their own use was continuous for five years, or at the very least, that plaintiffs failed to demonstrate by clear and convincing evidence which continuous five years they used the roads.

3. *The trial court did not abuse its discretion in declining to declare an equitable easement*.

Plaintiffs challenge the trial court's finding that they failed to provide sufficient evidence to support their claim for equitable easement.

"Through the doctrine of 'balancing conveniences' or 'relative hardship,' the trial court may create an easement by refusing to enjoin an encroachment or nuisance." (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 265 (*Linthicum*).)

"In appropriate cases in which the requirements for traditional easements are not present, California courts have exercised their equity powers to fashion protective interests in land belonging to another, sometimes referring to such an interest as an 'equitable easement.'  [Citations.]"  (*Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1008 (*Tashakori*).)  Three factors must be present to create an equitable easement:  "(1) [the trespasser's] trespass was ' "innocent" ' rather than ' "willful or negligent," ' (2) the public or the property owner will not be ' " 'irreparabl[y] injur[ed]' " ' by the easement, and (3) the hardship to the trespasser from having to cease the trespass is ' " 'greatly disproportionate to the hardship caused [the owner] by the

44

continuance of the encroachment.' " ' [Citations.]" (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19.)

"When reviewing a trial court's exercise of its equity powers to fashion an equitable easement, we will overturn the decision only if we find that the court abused its discretion. [Citation.]" (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1008.)

In *Linthicum*, the trial court found that the contested roadway "is the *only* access to the Butterfields' parcels" and that the Butterfields would suffer "catastrophic loss" were the easement not created. By contrast, the roadway did not affect Linthicum's right to fully develop his parcel. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 266, italics added.) Similarly, the *Tashakori* court applied the relative hardship test and found that the defendants would suffer virtually no harm from the plaintiffs' use of the shared driveway, whereas the plaintiffs would be irreparably harmed because the easement was the *sole* means of accessing the property. (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1010.)

Here, plaintiffs contend they will be irreparably harmed, not because Henry Ridge Motorway and Gold Stone Road is the only means of reaching their Section 1 property, as there are several other routes plaintiffs can use to travel from their Section 1 property to Topanga. Rather, plaintiffs argue Henry Ridge Motorway to Gold Stone Road "is the *quickest and most convenient route*." (Italics added.) Convenience is not sufficient under *Linthicum* or *Tashakori*, certainly not when compared to the irreparable harm to defendants by making their private, secluded land open to plaintiffs' convenience. Plaintiffs contend they will suffer irreparable harm if they cannot use Henry Ridge Motorway and Gold Stone Road in case of emergency. However, we accept the representation of the Erickson/Malicks and Schroders that they would allow plaintiffs to use these roads *in emergencies*. As for plaintiffs' Section 12 lot, Henry Ridge Motorway and Gold Stone Road do not even touch it, with the result there are no equities in plaintiffs' favor with respect to that land.

Finally, considering the parties' conduct to determine who is responsible for the dispute, plaintiffs are not innocent. (*Tashakori*, *supra*, 196 Cal.App.4th at p. 1009; *Linthicum*, *supra*, 175 Cal.App.4th at pp. 266-267.) Scher testified that since buying his

45

Section 1 property in 1998, he intended to establish rights across Henry Ridge Motorway and Gold Stone Road and he purchased his Section 12 property " 'partially to stick a thorn in my neighbor's side.' " The trial court did not abuse its discretion in declining to create an equitable easement.]]

[[End nonpublished portion]]

DISPOSITION

The judgment in favor of defendants on plaintiffs' causes of action for declarations of express, prescriptive, and equitable easements is affirmed. In all other respects, the judgment is reversed. The trial court is ordered to enter a declaratory judgment in favor of defendants consistent with the principles set forth in this opinion.

Defendants to recover costs on appeal.


**CERTIFIED FOR PARTIAL PUBLICATION**



ALDRICH, J.



We concur:



EDMON, P. J.



KITCHING, J.

46